IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| AHMAD SIMMONS, <br><br> Plaintiff, <br> v. <br><br> THE ILLINOIS DEPARTMENT OF CORRECTIONS, WEXFORD HEALTH SOURCES, INC. and DOES 1-10 <br><br> Defendants. | Case No. 18-cv-08186 <br><br> JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

Plaintiff, AHMAD SIMMONS, by his undersigned attorneys, complains against the above-named Defendants as follows:

**I. INTRODUCTION**

This case arises from the Defendants' mistreatment of Plaintiff Ahmad Simmons during his brief incarceration in the Illinois Department of Corrections ("IDOC"), an agency of the State of Illinois. Plaintiff suffers from Type-I diabetes and complications arising from that condition, including the eye conditions of macular edema, glaucoma, and diabetic retinopathy. Before his incarceration in the IDOC, Plaintiff lost vision in his right eye, and some but not all of the vision in his left eye, as a result of these conditions, and he became substantially visually impaired. Specialists at Stroger Hospital prescribed him medications and surgical procedures to maintain and preserve the vision that remained.

On December 13, 2017, Plaintiff pled guilty to a drug offense, and was sentenced to time served. Because he did not have his own permanent address, however, he was not allowed to go home as he planned. Instead, he was transferred to the IDOC's Stateville Northern Reception

1

and Classification Center ("Stateville NRC"), where he would remain for approximately one month. During that month, Defendants subjected Plaintiff to multiple deprivations of his civil rights under the United States Constitution, the Americans With Disabilities Act, the Rehabilitation Act, and state law. This misconduct caused Plaintiff to endure significant physical pain, and it left him totally blind.

IDOC contracts with Defendant Wexford Health Sources, Inc. ("Wexford") for the provision of healthcare to prisoners. Wexford and its employees knew that Plaintiff had serious medical conditions that required administration of prescription eye medications and proper management of blood sugar and blood pressure, and that Plaintiff could not self-administer his eye medications because of his existing visual impairment. Over Plaintiff's complaints, Wexford and its employees nonetheless refused to administer his medications, claiming they were "too busy" to help him. They also ignored Plaintiff's complaints that the insulin medication he was receiving was not effective, and that his blood sugar was therefore out of control. As a result, over the course of just four weeks, Plaintiff lost his remaining vision, becoming completely and permanently blind. To make matters worse, IDOC employee guards tormented Plaintiff on his twice-daily visits to the infirmary to receive insulin, mocking his vision impairment and refusing to escort him safely, leaving Plaintiff to bump into walls, gates, and other impediments, and leaving him bruised and humiliated on a daily basis.

In this lawsuit, Plaintiff seeks to recover against the Defendants on the following claims:

- ***Eighth Amendment Deliberate Indifference*** (against Wexford and Does 1-5). These defendants were aware of Plaintiff's serious medical needs and consciously disregarded a serious risk to him by failing to provide him with his prescription medications and effective medication to regulate his blood sugar. As a result, Plaintiff suffered permanent loss of sight and lost the opportunity to regain or maintain his vision.

- *Americans with Disabilities Act and Rehabilitation Act* (against the Illinois Department of Corrections). Plaintiff was disabled due to visual impairment, and needed reasonable accommodations so that he could receive his medications, travel safely to the infirmary, and be released from IDOC custody given that he had been sentenced to only time served. Plaintiff was denied these accommodations as a result of his disability – leading to his permanent loss of sight and all opportunity to regain or maintain vision.

- *Medical Negligence* (against Wexford and Does 1-5). Wexford and Does 1-5 had a duty to act as reasonable professionals when providing Plaintiff healthcare. Their refusal to provide him with a method to obtain his prescription eye medications was a breach of that duty. As a result, Plaintiff lost the opportunity to preserve his remaining vision, and went completely blind.

- *Eighth Amendment Cruel and Usual Punishment* (against Does 6-10). The Guard Defendants violated Plaintiff's Eighth Amendment rights when they refused to escort him safely to the infirmary, instead mocking him. As a result, Plaintiff became battered and bruised and suffered emotional injury.

- *Negligent Infliction of Emotional Distress* (against Wexford and Does 1-10). The Defendants each had a duty to Plaintiff to provide him with medication or safe transport, and failed in their duties. They knew or should have known that their failures would cause physical harm and severe emotional distress to Plaintiff, in the form of fear, anxiety, stress, shame, and humiliation. As a result of Defendants' failures, Plaintiff suffered from all of those things.

- *Intentional Infliction of Emotional Distress* (against Wexford and Does 1-10). Defendants' conduct was extreme and outrageous, and Defendants knew it was likely to cause Plaintiff severe emotional distress. As a result of their conduct, Plaintiff suffered from fear, anxiety, stress, shame, and humiliation.

## II. JURISDICTION AND VENUE

1. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act. The Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367, because they form part of the same case or controversy.

2. The Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this lawsuit arose in this judicial district.

### III. PARTIES

4. Plaintiff Ahmad Simmons is a resident of North Carolina. At the times relevant to this complaint, he was incarcerated at Stateville NRC, a facility operated by the IDOC.

5. Defendant Wexford is a private company that is under contract to provide medical care to IDOC prisoners. Wexford employed Does 1-5.

6. Defendant the Illinois Department of Corrections (IDOC) is an agency of the State of Illinois. The State, and the IDOC, receive federal funding. The IDOC has hired Wexford to provide medical care to its prisoners.

7. Defendant Does 1-5 (collectively, the "Medical Defendants") are doctors, nurses, or physicians assistants who were employees of Wexford or IDOC and who were responsible for Plaintiff's medical care while he was incarcerated at Stateville NRC. At all times relevant to this Complaint, they acted within the scope of their employment.

8. Defendant Does 6-10 (collectively, the "Guard Defendants") are IDOC guards who were responsible for providing Plaintiff with safe transport to the infirmary on a twice-daily basis, or who mocked or taunted him during transport, while he was incarcerated at Stateville NRC. At all times relevant to this Complaint, they acted within the scope of their employment and under color of law.

9. The Defendant Does are sued herein by fictitious names for the reason that their true names are unknown to Plaintiff at this time. Plaintiff will seek leave to amend this

complaint to allege the true names and capacities of these Defendants when their identities have been ascertained. Plaintiff is informed and believes, and based thereon alleges, that these fictitiously-named Defendants are responsible in some manner for the misconduct alleged herein.

## IV.   FACTS

10. Plaintiff Ahmad Simmons suffers from Type- I diabetes, a condition he was first diagnosed with at age 14.

11. Plaintiff suffers from several medical complications as a result of his diabetes. These include hypertension, gastroparesis, and a constellation of eye conditions including diabetic retinopathy, macular edema, and glaucoma.

12. Hypertension is high blood pressure.

13. Gastroparesis is a stomach condition which causes delayed gastric emptying and slower digestion of food.

14. Diabetic retinopathy affects the blood vessels in the back of the eye. At its advanced stage, it causes some blood vessels to close off, which causes new blood vessels to grow, or proliferate, on the surface of the retina. These abnormal new blood vessels can lead to serious vision problems and vision loss.

15. Macular edema is a condition which causes swelling in the macula and can also lead to vision problems.

16. Glaucoma is a group of diseases which can damage the optic nerve. People suffering from diabetes are more likely to develop glaucoma.

17. As a result of the foregoing eye conditions, Plaintiff became visually impaired by about March 2017. At that time, Plaintiff had no vision in his right eye, but was able to see forms, light and movement from his left eye.

18. Although Plaintiff was severely visually impaired, there were some tasks which he could do on his own, including: walking independently with a cane during the daytime, operating his cellular telephone by using an accommodation that highlighted text by putting light text against a dark background, perceiving faces from close distance in-person and in photographs, and telling night from day. Plaintiff was able to perform these activities because of the partial vision that remained in his left eye.

19. As part of controlling his diabetes and blood pressure, Plaintiff's doctors prescribed him twice-daily insulin injections and oral blood pressure medications.

20. In order to preserve what remained of his vision, Plaintiff's treating specialists, including physicians at the ophthalmology department of Cook County Health and Hospital System's Stroger Hospital, also prescribed several medications to treat and control his eye conditions. Among these were topical eye solutions (eye drops) to control intra-ocular pressure and oral medication to treat his glaucoma.

21. Prior to his incarceration at Stateville NRC, Plaintiff took at least four different types of prescription eye drops to preserve and maintain his vision. Each medication came in a separate bottle and was administered at a different interval throughout the day: one medication was administered once daily, another twice daily, another three times daily, and so on. Because of his visual impairment, Plaintiff could not distinguish among the eye drop medications by himself, and relied on the assistance of others to help him distinguish them. Prior to his incarceration at Stateville NRC, counselors at the residential facility where he was staying would assist him by identifying the drops for him so that he could administer them to his eyes at the proper times.

6

22. On December 13, 2017, Plaintiff pleaded guilty to a drug crime and was sentenced to time he had served at the Cook County Jail, from which he had been released well before the time of his plea. At the time of his plea, Plaintiff was told by his lawyer, the prosecutor, and the judge that he would not be required to spend any time in prison or jail.

23. Immediately after entering his plea, Plaintiff was transferred to Cook County Jail for a routine "dress in, dress out" procedure. However, Plaintiff was not released as planned. Upon information and belief, Plaintiff was not released because – not having a residence in Chicago – he had listed a hotel as his destination for the night, which is not permitted under IDOC parole guidelines.

24. As a result, the next day Plaintiff was transferred to Stateville NRC. He arrived there on December 14, 2017.

25. Upon Plaintiff's arrival, prison officials, aware of his disability due to visual impairment, transported him to a handicap-accessible cell in a wheelchair.

### *Eye Medications*

26. Plaintiff was seen by Defendant Doe 1 for medical intake screening on or about December 15, 2017.

27. On information and belief, Defendant Doe 1 was a licensed physician who was responsible for Plaintiff's medical care throughout his stay at Stateville NRC, and had responsibility and authority to order that he receive medication and access to medication.

28. Defendant Doe 1 examined Plaintiff's eyes, on information and belief using a slit lamp. Defendant Doe 1 noted that Plaintiff's eyes were seriously damaged from his existing eye conditions and, for that reason, called in at least three other medical professionals or trainees to examine their condition.

29. Defendant Doe 1 told Plaintiff that he was would be provided at least four types of prescription eye drops to treat his eye conditions.

30. For at least one more day, however, Plaintiff received no eye drop medications whatsoever. On approximately December 16, 2017, Nurse Roe (who is not named as a defendant at this time, unless he is one of the Defendant Does mentioned below) finally came to Plaintiff's cell with approximately five eye drop medications. Nurse Roe told Plaintiff he would have to self-administer the medications in his cell. Plaintiff explained to Nurse Roe that, due to his visual impairment, he was unable to self-administer the medications. In response, Nurse Roe left one or two bottles of eye medication, which were supposed to be administered only once daily, with Plaintiff to administer to himself. Nurse Roe took the remaining eye medications, which were supposed to be administered multiple times per day, back to the infirmary, and told Plaintiff that medical staff would come by to help him administer the drops during medication rounds. Plaintiff believed that this plan was feasible, since the medications left with him were to be administered only once daily, and he would be able to administer the drop to himself at approximately the same time each day, when his dinner tray arrived.

31. Later that same day, Defendant Doe 2 came to Plaintiff's cell with the three eye drop medications that Nurse Roe had brought back to medical. Defendant Doe 2 told Plaintiff that medical staff was too busy to administer these eye medications. Plaintiff explained to Defendant Doe 2 that he would not be able to distinguish among the different bottles of drops or know what time to give them to himself and, accordingly, that he would be unable to administer them. Defendant Doe 2 responded that if she brought the drops back with her to the medical unit, Plaintiff would never get them. She then left the medications with him in the cell.

32. Now, Plaintiff had five different eye medications in his cell, each of which was packaged in the same manner. Each medication was to be administered on a different schedule and frequency, resulting in a different dose per day.

33. Plaintiff was unable to self-administer the prescription eye medications because he could not read their labels or distinguish them, and thus he could not provide himself with the medications at the proper time. Afraid to overdose on drops, he did not know what to do.

34. Beginning that day and at least once daily thereafter, Plaintiff told the Medical Defendants, that he needed help administering his eye medications because he could not administer them himself. Normally, Plaintiff had the opportunity to make this complaint to the Medical Defendants when he would travel to the infirmary for his twice-daily insulin injections. Plaintiff informed Medical Defendants that he needed the eye drops to maintain his intra-ocular pressure and eye health, and that he risked losing his vision if he did not receive them. He told Medical Defendants that he was experiencing pain and pressure in his eyes. Despite being aware of Plaintiff's eye conditions, his visual impairment, and his need for the medications, Medical Defendants refused to help him administer the medications.

35. Alone in his cell, with no cellmate and with no help from jail or medical staff, Plaintiff had no way to properly administer his eye medications. Afraid of overdosing on the prescription medications, Plaintiff resorted to his best option: he administered one drop from each bottle to himself one time per day. Plaintiff was aware that he was receiving inadequate doses and frequencies of 3 of the 5 prescription medications, but he had no way of determining which ones.

36. Having already lost vision in one eye, Plaintiff was terrified of losing his sight in the other one. At every opportunity, which usually was twice per day, Plaintiff pleaded with the

Medical Defendants to help him administer the drops, explaining the gravity of the situation. He told them that his eyes were in pain and his limited vision was deteriorating. But despite his pleas, the Medical Defendants did nothing. Plaintiff was not provided any accommodation that allowed him to take his eye drop medications as prescribed during the approximately four weeks he was at Stateville NRC.

37. Within about a week, Plaintiff noticed a decrease in his ability to see light and movement from his left eye. His sight steadily worsened over the next weeks, until he lost it completely before leaving Stateville NRC.

### *Diabetes Medication*

38. Defendants were aware that Plaintiff was a diabetic who required insulin injections to maintain healthy blood sugar levels. The Medical Defendants told Plaintiff they were prescribing him a "70/30" insulin medication to be injected twice daily.

39. "70/30" refers an insulin medication composed of both long-acting and short-acting insulin. The medication contains 70% intermediate or long-acting insulin, and 30% short-acting insulin.

40. Plaintiff told the Medical Defendants that 70/30 medication would not work for him due to his gastroparesis. He told them that he needed a long-acting diabetes medication like Lantus in order to keep his blood sugar under control. The Medical Defendants told Plaintiff that he would not be given the long-acting insulin he needed because Lantus was too expensive, and the prison would not pay for it.

41. As a result of improper medication, Plaintiff's blood sugar quickly started going out of control. Plaintiff was feared for his health, including his eye health and vision. He knew that out-of-control blood sugar created serious risks. Throughout his incarceration at Stateville

NRC, he told the Medical Defendants that he needed different insulin medication. The Medical Defendants had the responsibility and ability to prescribe him with more effective medication, but they refused. As a result, his blood sugar spiraled out of control and created additional risks to his physical health and vision.

### *Transport to the Infirmary*

42. Due to his diabetes, Plaintiff requires twice-daily insulin injections. At Stateville NRC, Plaintiff was to travel to the infirmary for these treatments and to have blood sugar levels tested. Because of his visual impairment, Plaintiff had difficulty traveling to and from the infirmary. Defendant John Does 6-10 (the "Guard Defendants") are the prison guards who were assigned to transport him or who involved themselves in this process. Instead of guiding Plaintiff as was required, Guard Defendants would walk behind Plaintiff, taunting him. The Guard Defendants would also stand alongside Plaintiff and shine a flashlight in his eyes to make fun of him. They would hold fingers up, saying "How many fingers am I holding up?" and they would laugh when Plaintiff could not answer or bumped into things.

43. At the beginning of his incarceration, Plaintiff had an easier time walking to the infirmary without any assistance. However, as his remaining sight began to diminish and disappear, it became more difficult and then impossible. Plaintiff would bump into doors, walls, gates, and other items. He was bruised and sore.

### *Residential Reentry Center Accommodation*

44. Having been sentenced to time served, Plaintiff should not have been required to stay at Stateville NRC for any period of time. Approximately one week after arriving, Plaintiff was told by a pre-parole board that they had had found a Residential Reentry Center (also known as an "RRC," or halfway house) that could take him.

45. RRCs are under contract with the State of Illinois and IDOC to provide accommodations to prisoners who are released from the IDOC.

46. Then, however, the pre-parole board informed Plaintiff that the RRC would not accept him because of his visual impairment, and that it would have to continue looking for a shelter that would accept him despite his disability. In the meantime, Plaintiff would have to remain at Stateville NRC.

47. Plaintiff then spent approximately two more weeks at Stateville NRC while a halfway house which would accommodate his disability was located.

48. If Plaintiff had not already been visually impaired, he would have left Stateville NRC as many as three weeks earlier, and would have had the opportunity to receive the proper care and treatment he needed to preserve his vision. As with the residential home where he was staying immediately prior to his incarceration, he would have been able to obtain assistance in administering his medications and better maintain his blood sugar and insulin levels.

### *Plaintiff Loses Vision Completely and Permanently*

49. As a result of Defendants' actions, Plaintiff was forced to spend a month without access to necessary medications to treat his eye conditions and control his intra-ocular pressure, all while his vision was at heightened risk because Defendants were not providing proper care for his diabetes and hypertension.

50. As a result of his uncontrolled intra-ocular pressure and blood sugar during his incarceration – and just as he had feared – Plaintiff lost all remaining vision in his left eye.

51. Plaintiff also suffered physical pain due to his inability to take his eye medications at IDOC. His eyes hurt constantly.

52. When Plaintiff was released from prison, he was seen as soon as possible by the Stroger Hospital clinic that treated him prior to his incarceration. There, his doctors informed

12

him that there was no longer anything that could be done to restore the vision he had lost while incarcerated.

53. Plaintiff has suffered a significant loss of sight, mobility and independence as a result of Defendants' actions. He no longer sees light, movement, or anything at all. He cannot operate a telephone by sight, perceive or see people around him, tell what time of day it is, or walk independently with a cane. He is permanently blind.

## Count One
**Americans with Disabilities Act** (42 U.S.C. § 12101 *et seq.*)
(against the Illinois Department of Corrections, an agency of the State of Illinois)

54. Each paragraph of this complaint is incorporated as if fully restated here.

55. Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

56. To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

57. The IDOC is a public entity as defined in 42 U.S.C. § 12131(1).

58. Plaintiff has a disability within the meaning of the Americans with Disabilities Act.

59. Plaintiff is otherwise qualified to participate programs, services, or benefits offered by the IDOC, which are described in this Complaint.

60. Under the Title II of the ADA and 28 C.F.R. § 35.130(a), the IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

61. Despite Plaintiff's known and obvious disability, the IDOC failed to reasonably accommodate his disability and discriminated against him, as described herein.

62. Because of Plaintiff's disability, the IDOC excluded and denied him access to each program, service, or benefit described herein. Thus, Plaintiff has been subjected to discrimination in each program, service, or benefit as a result of his disability.

63. Plaintiff has been injured and continues to be injured as a result of this discrimination, as described elsewhere in this complaint.

<u>**Count Two**</u>
**Rehabilitation Act** (29 U.S.C. § 701 *et seq.*)
(against the Illinois Department of Corrections, an agency of the State of Illinois)

64. Each paragraph of this complaint is incorporated as if fully restated here.

65. Plaintiff has a disability within the meaning of the Rehabilitation Act.

66. Plaintiff is otherwise qualified to participate in programs, services, or benefits offered by the IDOC, as described herein elsewhere in this complaint.

67. Under the Rehabilitation Act the IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability,

excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

68. The IDOC receives federal funding.

69. Despite Plaintiff's known and obvious disability, the IDOC failed to reasonably accommodate his disability, as described herein.

70. Because of Plaintiff's disability, the IDOC excluded and denied him access to each program, service, or benefit described herein. Thus, Plaintiff has been subjected to discrimination in each program, service, or benefit as a result of his disability.

71. Plaintiff has been injured and continues to be injured as a result of this discrimination, as described elsewhere in this complaint.

## Count Three
### Eighth Amendment to the United States Constitution
(against Does 1-10)

72. Each paragraph of this complaint is incorporated as if fully restated here.

73. Plaintiff has a serious medical need that presented a risk to his health and safety.

74. In the manner described more fully above, Does 1-5 acted with deliberate indifference to Plaintiff's condition.

75. In the manner described more fully above, Does 6-10 intentionally endangered Plaintiff, not for a legitimate penological purpose, but for the purpose of harming and humiliating him.

76. The misconduct describe in this count cause harm to Plaintiff, including severe physical pain, terror, and permanent blindness.

## Count Four
### Medical Malpractice
(against Wexford and Does 1-5)

15

77. Each paragraph of this complaint is incorporated as if fully restated here.

78. Defendant Wexford had a duty to provide ordinary and reasonable care for Plaintiff's health.

79. Does 1-5, acting as agents for Wexford, had a duty to act as a reasonable medical professional would under the circumstances.

80. In a manner described more fully above, Defendants Wexford and the Medical Defendants breached that duty were negligent and breached that duty in the following ways:

   (a) Failed to provide Plaintiff with a way to accurately and safely administer his prescribed eye medications;

   (b) Failed to ensure that Plaintiff was able to receive his prescribed eye medications;

   (c) Prevented Plaintiff from receiving proper dosages of his prescribed eye medications;

   (d) Ignored Plaintiff's complaints that he could not accurately and safely administer his prescribed eye medications and that he was suffering eye pain and pressure as a result, and that he feared he would lose his remaining eyesight; and

   (e) Other failures to be learned during the course of discovery.

81. The misconduct describe in this count cause harm to Plaintiff, including physical pain, terror, blindness, and permanent loss of opportunity to preserve or regain sight.

82. The Affidavit of one of Plaintiff's attorneys and a written physician report required by 735 ILCS 5/2-622 are attached as Exhibit 1 and Exhibit 2 to this Complaint.

**Count Five**
**Negligent Infliction of Emotional Distress**

(against Wexford and Does 1-10)

83. Each paragraph of this complaint is incorporated as if fully restated here.

84. Does 1-5, who are agents of Wexford, had a duty to act as a reasonable medical professional would under the circumstances.

85. Does 6-10 had a duty to escort Plaintiff safely to the infirmary and not humiliate him while doing so.

86. Does 1-10 violated their duties to Plaintiff.

87. As a result of the foregoing, Plaintiff suffered actual physical harm and severe mental distress and anguish.

### Count Six
### Intentional Infliction of Emotional Distress
(against Wexford and Does 1-10)

88. Each paragraph of this complaint is incorporated as if fully restated here.

89. The conduct of Does 1-5, who are agents of Wexford, was extreme and outrageous.

90. The conduct of Does 6-10 was extreme and outrageous

91. Does 1-10 knew or should have known that their misconduct foregoing had a high probability of causing severe mental distress.

92. Does 1-10 were the actual cause of Plaintiff's severe mental distress.

\* \* \*

**WHEREFORE**, Plaintiff Ahmad Simmons respectfully requests that he be granted the following relief:

1. Declare that the Defendants' conduct as alleged herein violates Plaintiff's rights under the following laws:

    a. the Americans with Disabilities Act;

17

  b. the Rehabilitation Act;

  c. the Eighth Amendment prohibition against cruel and unusual punishment;

  d. Illinois state tort law.

2. Award actual damages for injuries suffered by Plaintiff as a result of the conduct described herein.

3. Award punitive damages against each of the defendants except the IDOC.

4. Award costs and attorney's fees.

5. Award all other relief that is just and proper.

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all issues so triable.

March 5, 2019          /s/ Alexis G. Chardon

                Alexis G. Chardon – ali@weilchardon.com
                Stephen H. Weil – steve@weilchardon.com
                Weil & Chardon LLC
                333 S. Wabash Avenue, Suite 2700
                Chicago, IL 60604
                (312) 585-7404

                *Attorneys for Plaintiff Ahmad Simmons*

**CERTIFICATE OF SERVICE**

      I hereby certify that on March 5, 2019, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

/s/ Alexis Chardon